**C & H TRANSPORTATION COMPANY, Inc., Plaintiff,**

v.

**UNITED STATES of America and Interstate Commerce Commission, Defendants.**

**Civ. A. No. 3–789.**

United States District Court
N. D. Texas,
Dallas Division.

Dec. 10, 1965.

Davidson, J., dissented.

William P. Fonville, Dallas, Tex., W. T. Brunson, Oklahoma City, Okl., for plaintiff.

Nicholas deB. Katzenbach, U. S. Atty. Gen., Washington, D. C., by William H. Orrick, Jr., Asst. Atty. Gen., John H. D. Wigger, Washington, D. C., Melvin M. Diggs, U. S. Atty., Dallas, Tex., by Charles D. Cabaniss, Asst. U. S. Atty., Robert Ginnane, Gen. Counsel, I. K. Hay, Associate Gen. Counsel, Leonard S. Goodman, Asst. Gen. Counsel, I. C. C., Washington, D. C., for defendants.

Thomas E. James, Phillip Robinson, James, Robinson & Starnes, Austin, Tex., Carl L. Phinney, Leroy Hallman, Phinney, Hallman & Pulley, Joseph M. Stuhl, Wise & Stuhl, Dallas, Tex., for intervenors.

Before BROWN, Circuit Judge, and DAVIDSON, and HUGHES, District Judges.

HUGHES, District Judge.

The question presented in this action is whether the order of the Interstate Commerce Commission denying plaintiff C. & H Transportation Company authority to acquire certain rights from another motor carrier on the grounds that the rights in question have been found to be dormant and that no public need for their reactivation exists is supported by substantial evidence in the record before the Commission.

The relevant facts surrounding this transaction are carefully set out in the two opinions by Commissioner Tuggle on behalf of the I.C.C.[1] and need not be repeated here.

C & H Transportation Company filed this action to review and enjoin enforcement of the I.C.C. order under 28 U.S.C. §§ 1336 and 2321. A three-judge district court was appointed as required by 28 U.S.C. §§ 2325 and 2284.

## SCOPE OF REVIEW

The function of this court is a very limited one. Section 5 of the Interstate Commerce Act, 49 U.S.C. § 5, assigns the responsibility of approving the sale of interstate motor carrier rights solely to the I.C.C. The Commission, with its decades of experience in this field, is far better equipped than we are to determine these questions. So long as it has not abused the discretion Congress delegated to it and its findings are supported by substantial evidence in the record, our duty is to sustain the Commission's order "even though the court would justifiably have made a different choice had the matter been before it *de novo.*" Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 488, 71 S.Ct. 456, 465, 95 L.Ed. 456 (1951); McLean Trucking Co. v. United States, 321 U.S. 67, 87–88, 64 S.Ct. 370, 88 L.Ed. 544 (1944); Alamo Express, Inc. v. United States, 239 F.Supp. 694, 697 (W.D.Tex. 1965); Administrative Procedure Act, Sec. 10(e), 5 U.S.C. § 1009(e).

Where the hearing examiner and the Commission reach different conclusions, the task may be a bit more difficult, but the rule remains the same. We are required to examine the record as a whole, including the testimony taken before the examiner and the examiner's report, to determine whether there is substantial evidence to support the conclusions of the Commission. Section 8(a) of the Administrative Procedure Act, 5 U.S.C. § 1007(a),[2] provides that the agency have full power to reach any conclusions it would have reached in the absence of a hearing examiner's initial decision.

In Universal Camera Corp. v. N.L.R.B., supra, 340 U.S. at 492, 71 S.Ct. at 467, the Supreme Court stated in interpreting Section 10(c) of the Labor Manage-

---

1. Belyea Truck Co.,—Purchase (Portion)—Ferguson Trucking Co., 90 M.C.C. 139 (1962); C & H Transportation Co. —Purchase (Portion)—Ferguson Trucking Co., 93 M.C.C. 741 (1964).

2. The pertinent language of the statute reads:
   "On appeal from or review of the initial decisions of such officers the agency shall * * * have all the powers which it would have in making the initial decision."

ment Relations Act, 61 Stat. 147, 29 U.S.C. Sec. 160(c):

"The responsibility for decision thus placed on the Board is wholly inconsistent with the notion that it has power to reverse an examiner's findings only when they are 'clearly erroneous.' Such a limitation would make so drastic a departure from prior administrative practice that explicitness would be required."

Four years later the Supreme Court applied this statement to all proceedings under the Administrative Procedure Act. F. C. C. v. Allentown Broadcasting Co., 349 U.S. 358, 75 S.Ct. 855, 99 L.Ed. 1147 (1955).

In a case in which the administrative circumstances were similar to the situation facing us in this case, the Fifth Circuit stated:

" * * * it is the board's findings and not those of the examiner which we are to review."

The final obligation to determine the facts, the Court noted, rests solely with the administrative board. N. L. R. B. v. Akin Products Co., 5 Cir., 209 F.2d 109 (1953).[3]

## DORMANCY

On the question of whether the vendor's rights were dormant, the purchasing carrier has the burden of proving actual operations prior to the date that temporary leasing authority was granted. C & H Transportation Company failed to prove a single shipment by the vendor under those rights now before us. Similarly, when the vendor's president, Jim L. Ferguson, testified as to his operations, he acknowledged that the exhibits before the Examiner did not show a single operation along those routes.[4]

We hold that the evidence in the record clearly sustains the Commission's findings that the routes were dormant and that C & H Transportation Company failed to meet its burden of demonstrating operations by the vendor on those routes.

---

3. This question is thoroughly analyzed in 2 Davis, Administrative Law Treatise, Sec. 10.04 (1958).

4. The applicable excerpts from the testimony reads:

Q. Well, let me get at it a little quicker. Do you find any shipments in there that are between Texas, on the one hand, and Arizona on the other hand?
A. Any in here anywhere?
Q. Yes.
A. Well, I know we have made some. I'd just have to go through it and look.
Q. Well, will you look through there.
A. I know we made some. We have been moving some rigs there from Texas to Arizona.
Mr. Van Osdel: Just a moment. Mr. Examiner, I object to the answer as not being responsive.
Exam. Zurlo: Objection sustained.
Mr. Van Osdel: In view of the ruling, Mr. Examiner, then I ask that the answer be stricken.
Exam. Zurlo: It may be stricken.
* * * * *
Q. And there are none there, are there, between Arizona, on the one hand, and Texas, on the other hand, is that correct?

A. I didn't see any.
(Transcript, pp. 74–76)
* * * * *
Q. And there were no Kansas shipments at all?
A. Not to my knowledge.
Q. Well, sir, did you examine the Exhibit?
A. Yes, sir.
Q. You didn't find any, did you?
A. No, sir.
(Transcript, p. 106)
* * * * *
Q. With respect to the states of Texas and Arizona, were there any shipments on that exhibit between those states?
A. Gosh, I don't remember whether I answered that or not or whether he asked me that or not.
Q. He didn't sir; that's why I am asking.
A. Oh, I'll have to see. Between Texas and Arizona?
Q. Yes, sir.
A. No, sir, there's none on this exhibit.
(Transcript, pp. 116–17)

## REACTIVATION OF DORMANT ROUTES

■ Once dormancy has been found, the purchasing carrier has the burden of proving a public need for his service in order to justify the reactivation of dormant routes. Logically, the Commission then requires the same degree of proof in an application to reactivate routes wholly unused as in this case as it would in an application for new routes. See Note, Federal Regulation of Trucking: The Emerging Critique, 63 Colum. L.Rev. 460, 489 n. 177 (1963). The purchaser's obligation here would be to "demonstrate by shipper testimony that a need for additional service is present or immediately foreseeable—and, conversely, upon protest of authorized carriers, that the existing service offered is physically incapable of meeting shipper demands." Note, Federal Regulation of Trucking, supra, 63 Colum.L.Rev. at 469. Accord, T.S.C. Motor Freight Lines, Inc. v. United States, 186 F.Supp. 777 (S.D.Tex.1960), aff'd per curiam sub nom., Herrin Transp. Co. v. United States, 366 U.S. 419, 81 S.Ct. 1356, 6 L.Ed.2d 387 (1961).

Four shipper witnesses testified in C & H Transportation Company's behalf. One of them disclosed plans to use its services along these routes in the future,[5] but on cross-examination acknowledged that C & H Transportation Company "would be just one additional carrier providing operations into Arizona." [6] Another shipper witness expressed a need for C & H Transportation Company's operations, but admitted later that he had not checked the availability of other carriers for two years prior to the hearing.[7]

Two additional shipper witnesses expressed a desire for single-line service for heavy and cumbersome commodities from points in Ohio and Pennsylvania to

Arizona by combining the existing routes of C & H Transportation Company with the vendor's dormant routes. One of them conceded that he had made only five shipments via the service provided by C & H Transportation under its temporary authority between Ohio and Arizona in the two years prior to the hearing.[8] Most of that shipper's transportation needs were fulfilled by railroad service.[9] The other shipper witness testified that his company had used the services of C & H Transportation Company into Arizona only once during the three and a half years of temporary operating authority.[10]

■■ C & H Transportation Company argues further that the substantial quantity of shipments under the temporary authority, without great financial hardship to competitors, demonstrates a public need for reactivation of the routes. This would certainly be a relevant factor in evaluating public need, but as the Commission stated, such evidence alone does not establish public need. The Commission has reasonably inferred that any aggressive carrier can acquire operations under temporary authority even though adequate service by competitors is readily available.[11] As was recently stated, "a basic ingredient in the determination of 'public convenience and necessity' is, and has consistently been held to be, whether the existing facilities are inadequate to meet present or future transportation requirements." Curtis, Inc. v. United States, 225 F.Supp. 894 (D.Colo.), aff'd per curiam, 378 U.S. 128, 84 S.Ct. 1658, 12 L.Ed.2d 744 (1964). See also Hudson Transit Lines, Inc. v. United States, 82 F.Supp. 153 (S.D.N.Y.1948), aff'd per curiam, 338 U.S. 802, 70 S.Ct. 59, 94 L.Ed. 485 (1949).

The testimony of plaintiff's own shipper witnesses demonstrates clearly that, while they might prefer C & H Trans-

---

5. Transcript, p. 522.

6. Transcript, p. 530.

7. Transcript, p. 545.

8. Transcript, p. 961.

9. Transcript, p. 963.

10. Transcript, p. 969.

11. See Transcript, p. 1108.

portation Company's services along the dormant routes, there was no great difficulty in obtaining services from competing carriers or that only C & H Transportation Company could fulfill their shipping requirements.

We therefore affirm the order of the Commission and dismiss the complaint. This Court's temporary restraining order against the Commission issued on March 3, 1965, is hereby vacated.

DAVIDSON, District Judge (dissenting).

I dissent for the reasons set forth in the following proposed opinion which the majority found unacceptable and which I now adopt as my dissent without making a redraft of the proposed opinion.

This case stems from the dissolution or division of the transportation rights of the Ferguson Transportation Company which resulted from its becoming insolvent by certain reverses in the late 50's.

As a result of its financial embarrassment it transferred certain of its rights previously granted to it as a matter of convenience and necessity over certain areas and transportation lines to the Belyea Corporation of Los Angeles, transferring its right of operation west into New Mexico which seems to have ultimately included Arizona. Other transfers were made to different transportation and hauling concerns.

After these transfers, Ferguson's rights or holdings were put up at public auction and sold for a consideration of $54,000.00 to plaintiff.

The order of the Commission of February 26, 1964 withheld approval of the purchase by plaintiff from Ferguson Trucking Co., Inc., of the specifically described rights on the ground that the transfer of the rights to plaintiff was not consistent with the public interest for the reason that the rights were dormant while yet in the hands of Ferguson Trucking Co.

Ferguson Trucking Co., Inc., was conducting operations in interstate commerce as an irregular route common motor carrier of oil industry commodities and heavy and cumbersome commodities, as authorized in Certificate of Public Convenience and Necessity MC–109770, including operations under the specifically described rights.

It became necessary for Ferguson Trucking Co., Inc., to sell its properties, including its rights under Certificate of Public Convenience and Necessity MC–109770. Ferguson Trucking Co., Inc., contracted to sell a portion of its rights to Belyea Trucking Company of Los Angeles, California. It then offered the remainder of its rights under the Certificate for sale at public auction on January 7, 1959. Each vendee of Ferguson rights then filed joint applications with the Interstate Commerce Commission for approval under Section 5 of the Interstate Commerce Act of the proposed transfers of Ferguson rights. The Interstate Commerce Commission granted only temporary lease rights on July 6, 1959. Plaintiff C & H Transportation Co., Inc., commenced operations under that temporary authority on July 8, 1959, including operations under the specifically described rights, and has conducted operations under such rights by virtue of that temporary authority.

The Interstate Commerce Commission, Division 3, then issued its report and order in which, in respect to the transfer of the specifically described rights to plaintiff, it found such transfer would not be consistent with the public interest for the reason that such rights were dormant.

The Ferguson rights to operate in the hauling of heavy freight have never at any time been either dead or dormant, and to so hold is contrary to every line of evidence in the record.

When Ferguson ceased to operate it, it leased it for a sum of money, and then C & H bought it at public auction for a sum of money. The Commission recognized its control by giving it temporary right of operation as a necessity and a convenience. Certainly there is nothing to indicate that anybody would

have paid $54,000 for the right to do something that was already dead or dormant. The Commission itself recognized that it was not such by ratifying the sale to C & H to the degree of granting it temporary license to operate, which operation was continued successfully up to this date and for more than 3½ years before challenged before the ICC or in court. It increased in the volume of business done almost to 100 per cent, and this was not dormant. It increased in the volume of business done during the temporary license several million dollars, and it could not have been asleep in so doing.

During the period of this lease it hauled to Arizona more than seven million pounds of freight and brought back freight from Arizona to Texas, and nobody disputes that. It hauled through northwest Texas out of that region west of Highway 75 and north of Highway 80 into Kansas, Wyoming, Colorado and Utah much freight.

Corpus Juris Secundum says that "dormancy" may mean sleep "but capable of activity."

On petition of plaintiff, the proceedings on the joint application of Ferguson Trucking Co., Inc. and plaintiff C & H Transportation Co., Inc., were reopened by the Interstate Commerce Commission by order dated September 17, 1962, a copy of which is shown as Appendix C. A hearing was held in the reopened proceeding before an examiner. The examiner, after hearing, made a report in which he found that the transfer to plaintiff of the specifically described rights *would be consistent with the public interest,* and ordered the transfer of such rights to plaintiff approved. A copy of that report is here referred to as Appendix D.

There is a well recognized practice, recognized by both parties to this case, to the effect that the fact finding body, person or group is entitled to every deference in favor of the facts as found by such body. This is true of the jury; it is especially true of the master, in some cases of the Referee in Bankruptcy.

However, it comes to our attention that the reason for that rule does not appear in this case. The fact finding body was not the Commission. The Commission made use of an examiner who performed all the functions of a master. It was thus due to base its findings upon his report. That report is now before the Court and the Court has everything before it that the Commission had. The reason for giving deference to it disappears under circumstances of the case, because the Court has every facility to examine into the facts that the Commission itself had, using the Commission's own examiner and his report.

A pertinent part of the examiner's report is as follows:

"No. MC–F–7115

"C & H TRANSPORTATION CO., INC.—PURCHASE (PORTION)— FERGUSON TRUCKING CO., INC.

. . . . . . . . . .

"Decided

. . . . . . . . . .

"Upon further hearing, purchase by C & H Transportation Co., Inc., of certain portions of the operating rights of Ferguson Trucking Company, Inc., and acquisition by W. O. Harrington of control of the operating rights through the purchase, approved and authorized, subject to conditions.

\* \* \* \* \* \*

"C & H's balance sheet as of September 30, 1962, shows assets aggregating $4,072,381, consisting of: Current assets $1,675,065, composed of cash $394,319, working funds $17,200, special deposits $6,044, notes receivable $5,000, receivables from affiliated companies $13,067, accounts receivable $1,167,785, and prepayments $71,650; carrier-operating property, less depreciation, $1,843,713; intangible property $206,312; investment securities and advances $1,819; deferred debits $345,170; and miscellaneous debits $301. Its liabilities were: Current liabilities $961,494, com-

prised of accounts payable $559,075, wages payable $43,468, taxes accrued $278,787, and other current liabilities $80,164; equipment obligations due within 1 year $509,048; advances payable $9,000; equipment and other long term obligations due after 1 year $584,124; deferred credits $1,785; capital stock $600,000; and earned surplus $1,406,930. From 1959 to the present date, the operating ratio of C & H has been between 90 and 92.6

\* \* \* \* \* \*

"Between July 8, 1959 and November 20, 1962, or approximately 3⅓ years as shown in Exhibit No. 134, C & H handled 249 shipments of the heavy and cumbersome and Mercer commodities of which 235, weighing 7,388,377 pounds moved from 25 points in Texas to 56 points in Arizona and produced revenue of $166,813 to C & H, and 14 shipments of those same commodities, weighing 487,929 pounds moved from 7 points in Arizona to 4 points in Texas, and produced revenue of $11,821.

\* \* , \* \* \*

"The operating rights of C & H duplicate the portions of the rights of Ferguson involved in the *Stone and Willis cases*. Under the transaction as revised and approved herein, C & H would acquire all of the operating rights of Ferguson, except those involved in the Belyea case. The recommended findings will provide for the elimination of all duplications. The only rights considered herein are those in which the prior report required cancellation because of dormancy, and those which duplicate C & H, including those set out in applicants petition. The evidence as previously set forth shows that under temporary authority, or for the past 3½ years, C & H transported a large volume of traffic between points in Kansas, on the one hand, and, on the other points in Arizona, Colorado, Utah and Wyoming, and between a certain area in Texas, on the one hand, and, on the other, points in Arizona. The evidence of two shippers show a public need for the movement of their traffic to points in Arizona."

As shown by Appendix A in the hearing of the Commission, some eight or ten different companies are listed and their volume of business. We select the three highest from this list:

|   |   | 1959 | 1960 | 1961 | 1962 |
|---|---|---|---|---|---|
| 1. | C & H | | | | |
| | Operating rev. | $6,732,238 | $7,228,930 | $9,243,334 | $9,554,800 |
| | Ratio | 91.6 | 93.17 | 90.75 | 92.92 |
| 2. | Rose | | | | |
| | Operating rev. | 6,030,052 | 5,809,253 | 6,535,848 | 6,531,456 |
| | Ratio | 95.0 | 95.8 | 87.5 | 92.96 |
| 3. | Parkhill | | | | |
| | Operating rev. | 2,845,462 | 3,487,449 | 3,438,492 | 4,264,661 |
| | Ratio | 100.1 | 96.0 | 97.9 | 96.3 |

The defendant ICC refused to confirm the claims of the plaintiff as found by its examiner on the ground that the asserted claim was dormant. Yet the figures show that in 1962 the plaintiff did business to the amount of nine million dollars, the highest of any of its competitors. This was done by it under

the temporary lease from Ferguson which had been approved by the Commission.

One might well infer that when a hauler is given a Certificate of Necessity and Convenience in a given area that he has some protection while operating in that area, but judging from the record and from the practice before us, no such attempt is made or expected. The certificate gives the right to operate and indicates his territory, but if somebody else invades it there is none to whom he may appeal. This is illustrated by that important section of Texas in the oil business lying north of Highway 80 and west of Highway 75. The oil business is so extensive in this area that a number of haulers enter it without question and their rights overlap when specific territory is allotted to them. This especially appears in the examiner's report with reference to an overlapping of C & H services to Arizona over routes supposedly controlled by Belyea. Thus for 3½ years this line from Texas to Arizona had been the territory of Belyea, but during that time C & H handled 249 shipments of heavy cumbersome Mercer commodities, of which 235, weighing 7,338,000 pounds moved from points in Texas to points in Arizona and produced revenue of $166,000 to C & H. Other shipments moved from Arizona into Texas at the same time. Yet all this while that territory was seemingly allotted to Belyea and there was apparently no complaint from it or any other source about the overlapping of business.

The territory covered by this controversy and over which the plaintiff has been operating well illustrates this principle. The plaintiff operated a large number of hauling machines adapted to the use and removal of very heavy traffic, sometimes referred to as the Mercer type, generally described in other places as very heavy or large and cumbersome, requiring a special type of machine in which to carry it. These loads were sometimes many, many thousand pounds, sometimes passing more than a hundred thousand pounds.

The plaintiff operated in the State of Texas and was especially allocated northwest Texas north of Highway 80 running westward from Dallas to the border and Highway 75 running north to Red River. This it will be seen includes all of the Panhandle and all of northwest Texas, including a great number of oil fields like Grey, Moore and Hutcheson in the Panhandle, like those fields known as the Permian Basin and fields that have made the cities of Midland and other cities to the west even larger. Almost all the counties, Scurry et al., in this vast area have oil producers that need the use of this heavy machinery. So much so is this true that it would appear that the Commission has overlooked any element of competition which is sometimes a matter that is due consideration between the parties.

Some of the statements and figures herein included are taken from the report of the Examiner Thomas J. Patrick who was designated to make an investigation for the benefit of the Commission. And although it didn't accept his recommendations it did not expressly or otherwise repudiate the vast amount of data which he collected and submitted to it and failed to accept his recommendation, or, as the plaintiff says, it refused to consider the evidence that was offered by Patrick. The findings of Patrick are corroborated in many portions of this record and controversy.

Consider for instance that when Ferguson leased this right and area to the plaintiff it must have been producing business or else the plaintiff would not have paid it for the lease or desired it. Therefore the area covered was a producing concern at the time that the temporary lease was made, the evidence showing that for 3½ years it was the most profitable business of any concern engaged in trucking or transporting heavy oil machinery. It would naturally follow that it was producing and was a live, profitable operating field at the time it was leased and prior thereto while it was being operated by the Ferguson Company and was therefore not

dormant at the time of this lease. Physical facts, acts and circumstances often speak more loudly than spoken words.

In reaching its decision the ICC stood aside the report of its Examiner Patrick and based its conclusions upon other matters which could only be evidence accumulated some 3½ or 4 years before. We insist that such was error upon part of the Commission. In the operation of an oil field things move and the situation today is not the same next year. To base its decision upon testimony taken of conditions some almost four years before and at a time when the hauling business was growing more and more in volume, it necessarily follows that the operation of a large moving concern must invest heavily in new machinery to meet the increase. Thus in 1959 the business and income to C & H was fixed at $6,700,000. In 1962 when the decision was rendered, the business for that year is fixed at $9,500,000, and other competing lines fairly well in proportion.

A decision under these conditions is tantamount to an ex post facto law which Congress is inhibited from passing.

A decision of a court may have the same effect upon the rights of men and parties as a statute enacted which interferes with the business operation at the given period.

If it is wrong for the Congress to pass an ex post facto act, it is wrong for a court to reach back for conditions long passed on which to base its findings.

Competition among carriers will generate courtesy towards the shipper as in other lines. Texas by reason of the very large petroleum industry has brought into being vast fleets of heavy vehicles capable of transporting objects of great weight and dimension. Such machines are in Texas because the oil business makes them needful. Northwest Texas has many productive oil fields, and the Interstate Commerce Commission finds it well and proper to grant more Certificates of Convenience and Necessity. Let them reduce these permits in number and a congestion of freight will follow.

Arizona and the West are booming in business, large cities are building, population increasing, all of which demands more freight of heavy quality. Some one must supply the demand. It may be that one line given time can do the job if the shipper at one end and the consumer at the other are patient and long-suffering and willing to wait. With two lines perhaps delay would not so often occur. If there is only one line, each shipper must wait his turn as in a small town with one drug store the clerk takes longer for his coffee and lets you wait. And he may show an attitude of impatience because you are waiting on him and that your presence bothers him. If a new store opens across the street he will take less time for his coffee and find more courtesy for you.

Our government naturally attaches great importance to the subject of competition and the enforcement of its anti-monopoly laws. Since so many different industries and businesses are subject to the monopoly tendency, can we say that the shipping or carrier business is free from it?

A multitude of suits are brought over the nation to suppress monopoly. If it appears in the transportation business, the Interstate Commerce Commission is in position to discourage any monopolistic tendency. It is true that each business should be given ample space to survive and furnish proper equipment, but we should not bend over backwards in doing so and thereby create a monopolistic situation which can be done by denying Certificates of Convenience and Necessity where the evidence shows the need for such.

The agent substitutes in all things for a principal. The situation is more or less analogous to the law of limitation, taking for illustration the five-year statute in real estate. The claimant or owner may use and occupy land for a period of three years and then lease it to his tenant for a period of two years. The two tenancies have completed the five years as fully as if it had been done by one man, and such is true of the work

that Ferguson was doing as carried on by the plaintiff up until the date of this hearing. There was no interregnum or break in the service, and dormancy never had a chance to set itself up. The business was not asleep.

This claim of plaintiff under the John Marshall process of reasoning from point to point is in every way sound and is entitled to stand up. It is true one may not find a "white horse" case dealing with the word "dormant." It is really remarkably true that a word carrying such weight in judicial procedure of this type should have been so lightly considered or treated by our lexicographers, encyclopedia makers and dictionaries.

Some writers treat the word "dormant" as applying to something that has been abandoned. 1 C.J.S. § 8: "Abandonment involves an intention to abandon * * *" In such case it is not dormant but *dead*. Corpus Juris also uses sleep, "not active although capable of it."

We really object to associating sleep with a dormancy that is sought to be employed in this case and think of the poem:

"Tired nature's sweet restorer, balmy sleep,

It too like the world its ready visits pay

Where fortune smiles.

The wretched it forsakes,

And flies to lids unsullied with a tear."

Tired nature may produce temporary sleep, but it is ever ready for revitalization.

The evidence is absolutely devoid of any basis for this finding. A review of such is here in order.

The vendor Ferguson without controversy owned and operated the privilege of a Certificate of Necessity and Convenience of a large area described as follows:

"Pursuant to certificate issued in No. MC–109770 on October 23, 1952, Ferguson is authorized to operate in interstate or foreign commerce, over irregular routes in the transportation of the following commodities:

"(1) Machinery, materials, supplies, and equipment incidental to, or used in, the construction, development, operation, and maintenance of facilities for the discovery, development, and production of natural gas and petroleum, Between points in Texas

"(2) Oil and gas field commodities (Mercer description) including the stringing and picking up of pipe,

(a) Between points in New Mexico, Oklahoma, Kansas, and that part of Texas north of U. S. Highway 80 and west of U. S. Highway 75, including points on the indicated portion of the highways specified.

(b) Between points in Texas within 250 miles of Seagraves, Tex.,

(c) Between points in Eddy, Lea, and Roosevelt Counties, N. Mex., on the one hand, and, on the other, points in Texas within 250 miles of Seagraves, and

(d) Between points in Kansas, New Mexico, Oklahoma, and that part of Texas north of U. S. Highway 80, and west of U. S. Highway 75, and within 250 miles of Seagraves, including points on the indicated portions of the highways specified, on the one hand, and, on the other, points in Arizona, Colorado, Utah, and Wyoming.

"(3) Heavy or cumbersome commodities, which, because of size or weight, require the use of special equipment,

(a) Between points in Texas and New Mexico,

(b) Between Seagraves and points in Texas within 250 miles of Seagraves and those in that part of Texas north of U. S. Highway 80 and west of U. S. Highway 75 beyond such 250 miles radius, in-

cluding points on the indicated portions of the highways specified, on the one hand, and, on the other, points in Arizona."

Subsequently to such grant in 1959 the said Ferguson received financial reverses in the way of insurance risks and fire by which it deemed it necessary to dispose of its rights.

"Pursuant to authority granted under section 210a(b), on July 6, 1959, as extended by orders of December 28, 1959, the four vendees in the prior report leased the respective portions of Ferguson's operating rights pending final determination of the applications under section 5, Belyea at a monthly rental of $300 for the first 6 months and $200 a month thereafter, Stone at a monthly rental of $75, C & H at a monthly rental of $145, and Willis at a monthly rental of $80. In each transaction the rentals under temporary authority were to be applied as partial payment of the agreed purchase price. C & H commenced operations under temporary authority on July 8, 1959.

\*　\*　\*　\*　\*　\*

"In order to meet the objections raised by the prior report in the separate purchases by Stone and Willis, C & H has submitted agreements with Stone and Willis dated June 4, 1962 to terminate their purchase agreements with C & H. Under the transaction as revised, C & H proposes to acquire all operating rights of Ferguson except those acquired by Belyea. \* \* \*

"C & H's balance sheet as of September 30, 1962, shows assets aggregating $4,072,381, consisting of: Current assets $1,675,065, composed of cash $394,319, working funds $17,200, special deposits $6,044, notes receivable $5,000, receivables from affiliated companies $13,067, accounts receivable $1,167,785, and prepayments $71,650; carrier-operating property, less depreciation, $1,843,713; intangible property

$206,312; investment securities and advances $1,819; deferred debits $345,170; and miscellaneous debits $301. Its liabilities were: Current liabilities $961,494, comprised of accounts payable $559,075, wages payable $43,468, taxes accrued $278,787, and other current liabilities $80,164; equipment obligations due within 1 year $509,048; advances payable $9,000; equipment and other long term obligations due after 1 year $584,124; deferred credits $1,785; capital stock $600,000; and earned surplus $1,406,930. From 1959 to the present date, the operating ratio of C & H has been between 90 and 92.6.

\*　\*　\*　\*　\*　\*

"Between July 8, 1959 and November 20, 1962, or approximately 3⅓ years as shown in Exhibit No. 134, C & H handled 249 shipments of the heavy and cumbersome and Mercer commodities of which 235, weighing 7,388,377 pounds moved from 25 points in Texas to 56 points in Arizona and produced revenue of $166,813 to C & H, and 14 shipments of those same commodities, weighing 487,929 pounds moved from 7 points in Arizona to 4 points in Texas, and produced revenue of $11,821. The individual shipments weighed from 1,594 pounds to 92,520 pounds of which 193 were classified as heavy and cumbersome commodities, 36 as Mercer description commodities, and 35 as falling in either category. Between August 10, 1959 and November 20, 1962, as disclosed in Exhibit 135, C & H transported direct and/or interlined 262 shipments of Mercer commodities and heavy and cumbersome commodities in Texas moving to and from points in Arizona and Texas under the rights of Ferguson, and others between points in Arizona, Texas and Oklahoma to and from various States.

\*　\*　\*　\*　\*　\*

"As shown in Exhibit 139, covering the period between July 6, 1959

and November 30, 1962, C & H handled direct and/or with connecting carriers, 46 shipments of Mercer commodities, weighing 1,870,393 pounds moving to or from points beyond New Mexico and Oklahoma, on the one hand, and, on the other, points in Arizona, Colorado, Utah and Wyoming. * * * "

These figures were compiled by the Commission's examiner, Mr. Thomas J. Patrick, a Hearing Examiner, who conducted the hearings and the protests to the matters under consideration. Mr. Patrick in summing up the evidence at the conclusion of the hearing employs the following language:

"The examiner is not convinced that approval of the transaction would adversely affect protestants so as to interfere with their common carrier obligations to render an efficient service to the shipping and receiving public in the considered territory, and in his opinion, applicants have met their burden that the purchase of the remaining portion of the operating rights of Ferguson authorized herein would be consistent with the public interest. * * * "

The ICC conducted no hearing of its own. Its only record was that made by its examiner, Mr. Thomas J. Patrick. Its conclusions must necessarily therefore be drawn from this report or from the more ancient reports of previous years.

When we stray too far from the record before us we may find ourselves unconsciously swayed by the trends that influence public sentiment or opinion. There are people who are found constantly quoting "all men are created free and equal" and they urge a levelling of things. Men are created free and given equal opportunity in the race of life, but neither the law of nature nor the law of the land can keep them so, else we would have to deny the effect of energy, talent and merit.

The unfortunate trend, however, finds one looking back and seeking to do over the things of yesterdays. Putting one's self in the place of the Commission he could conclude that having made a mistake in granting to plaintiff its temporary permit to operate for years as a matter of necessity and convenience was not the decision that it should have rendered at that time and that it gave the plaintiff too much, and in line with such thought be inclined to enter judgment nunc pro tunc. But to give judgment thusly it must be upon unchanged conditions or else the judgment is entered unjustly. Conditions have changed radically during this and previous years.

Thus when we look for a basis for the reasoning of the Commission and find none in the record one may not be blamed for beating the brush and searching the wood lots.

For the years 1957 to 1962 one leading competitor was Rose, another was Parkhill.

Operating Revenue

|          | 1957        | 1962        |
|----------|-------------|-------------|
| Rose     | $5,093,803  | $6,531,456  |
| Parkhill | 1,883,849   | 4,264,661   |
| C & H    | 3,528,144   | 9,554,800   |

The competitors kept a fairly even pace in the increase of their operating revenues and it should be borne in mind that the applicant C & H by reason of its temporary award of territory and privilege was the largest of the operators and its income would naturally if successfully operated increase on a like ratio.

Referring again to the findings of the Examiner Patrick commenting upon the relation of the several parties and that of the applicant, the Ferguson vendee, we find also the following comment:

" * * *Vendor, finding itself in difficult financial circumstances, sought to dispose of all of its operating rights, with a view to discontinuing business. It contracted first to sell to Belyea its authority to transport heavy and cumbersome commodities which because of size or weight require the use of special

equipment, between points in Texas and New Mexico. The remainder of its operating rights, subject to the prior Belyea contract, were then sold at public auction. Vendee herein, sometimes also called C & H, was the highest bidder for such rights at $54,000. C & H is a large carrier of heavy and cumbersome commodities, * * * "

It should be borne in mind that this hearing was not had before the Commission but as if often and usually done before the Commission's examiner. In this case it was Mr. Thomas J. Patrick. It was he who made other examinations for the Commission upon which they based their judgment and opinion using and adopting the evidence he had assembled. In overruling his recommendations and report the Commission does not cite a single line of evidence, but simply set it aside in a three-line declaration and declared it to be dormant. There was no evidence of dormancy. The foregoing, taken from the record made by Mr. Patrick, was that Ferguson was operating up until its financial disaster and at that time its estate had enough after selling a part to Belyea of California which was auctioned off for $54,-000 and this did not include the Ferguson equipment so far as the evidence shows but simply the right under the Certificate of Necessity and Convenience which was a permit to operate in a given territory.

The business was operating successfully under Ferguson or else C & H would not have wanted it and the other protestants would not be now contending for it. There was no time either under Ferguson or under the vendees when the lease and field of operation was not a profitable one.

The examiner's report was correct and should be sustained and judgment given for plaintiff.

It has been suggested in the proceedings that the Commission ought not to have granted the temporary authority which enabled the transportation by plaintiff which established the proof of public need for plaintiff's transportation under the specifically described rights. The answer is the temporary authority was granted, the circumstances which prove the public need followed.

Judgment should be for plaintiff that the proceedings be remanded to the Commission for action not inconsistent with this judgment.